

F I L E D
SEP 2 7 2018
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **(UNDER SEAL)** |
| | ) | |
| v. | ) | Criminal No. 1:18-MJ-458 |
| | ) | |
| SEAN SLATTERY | ) | |
| RENEE SKYE | ) | |
| | ) | |
| Defendants. | ) | |

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Ray Campbell, being duly sworn, depose and state as follows:

#### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Postal Inspector employed by the United States Postal Inspection Service

(USPIS). I have been a Postal Inspector with the USPIS since January of 2012 and am currently

assigned to the Fraud Team in the Washington Division, which investigates a variety of fraud

schemes involving the use of mail. Since 2014, I have been a member of DC Metro Area Fraud

Task Force, which is composed of federal, state and local law enforcement agencies to facilitate

criminal fraud investigations and sharing information and resources with other investigators. Prior

to my employment with the USPIS, I was a special agent for two federal law enforcement agencies

beginning in June 2004, which included the US Department of Education, Office of Inspector

General and US Department of Homeland Security, Immigration and Customs Enforcement.

2.      During my fourteen years as a federal criminal investigator, I have participated in

and conducted a variety of criminal investigations, primarily in crimes involving fraud, cyber-

crime and money-laundering. I have also led criminal investigations of mail fraud, wire fraud,

bank fraud, securities fraud and insider trading, tax fraud, bankruptcy fraud, money laundering,

aggravated identity theft, child pornography, unauthorized network access, bribery in violation of the Foreign Corrupt Practices Act and other charges. In 2004, I completed a 21-week special agent training academy at the Federal Law Enforcement Training Center in Glynco, Georgia.

3.      In my capacity as a United States Postal Inspector, I am currently involved in an investigation of Sean SLATTERY ("SLATTERY") and Renee SKYE ("SKYE") for an alleged conspiracy to commit mail fraud. Based on  law enforcement records, SLATTERY and SKYE appear to live at 10303 Appalachian Circle, Unit #108, Oakton, Virginia 22124 (the "RESIDENCE), within the Eastern District of Virginia.

4.      This affidavit is made in support of a complaint charging that from in or about December 2017, through in or about September 2018, SLATTERY and SKYE devised or intended to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises for the purpose of executing such scheme or artifice or attempting so to do, caused to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or taken or received therefrom, any such matter or thing, or knowingly caused to be delivered by mail or such carrier according to the direction thereon, in violation of 18 U.S.C. § 1341. Specifically, SLATTERY and SKYE executed a victim restitution scam that caused elderly victims to mail them thousands of dollars.

5.      The facts set forth in this affidavit are based on my personal knowledge obtained through the investigation, interviews of witnesses, information communicated to me by other law enforcement personnel with knowledge of the events and circumstances described, review of documents related to this investigation, review of law enforcement and other government records, and information and knowledge gained through training and experience. Unless

otherwise indicated, where the statements of other persons or the contents of documents and records are related herein, they are related in substance and in part, not verbatim.

6.      I am submitting this affidavit for the limited purpose of showing probable cause for the requested search warrants. This is not a complete statement of all of the facts I have learned during the investigation.

<u>STATEMENT OF PROBABLE CAUSE</u>

*Brief Description of the Fraud Scheme*

7.      Through my investigation, I have determined the victim restitution scheme works as follows: SLATTERY and SKYE appear to target elderly individual victims by soliciting them via telephone calls using false names. SLATTERY then attempts to convince these victims that he represents a government agency or related organization responsible for issuing victim restitution payments for a timeshare or other scam that had previously defrauded them. SLATTERY then asks these elderly victims for various amounts of cash, telling them they need to pay specific fees and taxes before they can receive their restitution checks, which SLATTERY claims will be in the hundreds of thousands of dollars. SKYE also speaks to victims by phone, claiming to be SLATTERY's coworker. SLATTERY continues to contact victims numerous times a day to demand payment, sometimes as much as a dozen times a day including late at night and weekends.

8.      Once elderly victims agree to send payment, SLATTERY instructs them to send their funds to SKYE. SLATTERY states that SKYE is another employee who handles receipt of payments. Victims are then directed to send these funds as: (1) purchase money orders through the US Postal Service, FedEx, and UPS; (2) money wires through Western Union, Money Gram, and Walmart; or (3) prepaid funds through Green Dot prepaid cards, in which the victim loads

3

cash at a retail store and SLATTERY and SKYE transfer the funds to their own Green Dot account with a PIN number provided by the victim.

9.     After victims send the money requested by SLATTERY and SKYE, SLATTERY tells them repeatedly that more money is needed. Victims who do not have access to immediate funds are asked what they can afford to pay, then told to withdraw cash from their fixed monthly income from retirement funds and social security. The amount the victims are directed to send vary between a couple hundred dollars to a couple thousand dollars at a time, depending on the amount the victim ultimately agrees to send.

10.    The investigation has also revealed that some of the identified elderly individuals appear to have something in common: they were previously defrauded in various timeshare scams dating back to approximately 2010. Despite these elderly individuals having been named as financial victims in separate criminal and civil investigations, nearly all of these timeshare fraud investigations involved defendants residing and/or operating "boiler rooms" in or near Del Ray Beach, Florida, the same place where SLATTERY and SKYE originally resided before moving to Virginia in 2017. A boiler room is known as a place or operation where high-pressure salespeople use banks of telephones to call individuals from a lead list[1] in order to peddle speculative, often fraudulent, investments and services. Based on my training and experience, I know scammers obtain these lead lists—frequently comprised of elderly and other vulnerable individuals—which are then sold and resold among scammers, identity thieves and cyber-criminals throughout the world.

---

[1] A lead list can be used and sold by legitimate telemarketers and the information generally includes an individual's name, address and phone number and in some cases an age or an age range. Scammers among other criminals, compile and modify lead lists to include primarily elderly or other vulnerable individuals to increase the likelihood of obtaining funds through deceit (also known as the "suckers list"). After a scammer has successfully defrauded an individual, they resell the individuals information to potentially thousands of other scammers at a specific price, primarily through anonymous email lists and internet chat rooms.

*Elderly Victim D.H.*

11.     In July of 2018, a USPIS analyst found a complaint submitted by the son and legal guardian of D.H. ("DH"), his 90-year old mother, while conducting routine reviews of fraud complaints filed with USPIS within Virginia. DH's son resides in the house next to DH in Tennessee. DH's son reported that DH was being victimized in a restitution scam perpetrated by a man named "Eric Green." DH's son determined that DH had made over a dozen payments to "Eric Green" through the mail, by wire and prepaid cards since at least December of 2017. DH was a victim of a previous time share scheme in Florida, and DH believed these payments would be used to pay fees and taxes to receive victim restitution related to the scheme.

12.     DH's son also found notes taken by DH and phone numbers from her caller ID, which revealed that the phone number of "Eric Green" was (305) 922-XXXX (known by law enforcement). These notes also indicated a female named "Sophia" also worked with "Eric Green." A search of a commercial database revealed the phone number for "Eric Green," (305) 922-XXXX was used by SLATTERY. Further, that database indicated SLATTERY currently lives at the RESIDENCE with SKYE. DH's son further stated that "Eric Green" was still calling DH asking for additional money, and "Eric Green" told DH to send payments to "Eric Green's" assistant, Renee SKYE, at the RESIDENCE.

13.     On or about July 19, 2018, DH and her son provided consent to conduct several recorded calls with "Eric Green." Both "Eric Green" and "Sophia" spoke to DH during these recorded calls. Eventually, "Eric Green" requested that DH send money to the RESIDENCE in the name of "D. Pomponio" so DH could receive a large restitution check. Postal Inspectors directed DH to tell "Eric Green" she was mailing a $275 money-order because that was all she could afford at the moment, and they gave DH a tracking number to provide to SLATTERY.

Postal Inspectors in Virginia then purchased a genuine money order for delivery to the RESIDENCE in an envelope. The envelope tracking number and scan history was controlled and manipulated by USPIS to give SLATTERY and SKYE the appearance it was actually mailed from DH's home in Tennessee. On a later recorded call on or about July 23, 2018, "Sophia" told DH that the money order had not arrived to the RESIDENCE, and that "Sophia" had to verify where it was because "Sophia" was working out of temporary office space where her computer was located.

14.     On July 25, 2018, USPIS updated the tracking information for the envelope carrying the money order to show "Out for Delivery." A postal inspector, wearing a postal carrier uniform and driving an official USPS carrier vehicle, then delivered the envelope to the RESIDENCE. This inspector was equipped with a concealed video recording device along with the envelope, and other inspectors were also conducting surveillance at the RESIDENCE at this time. Upon arriving and walking up to the RESIDENCE, the postal inspector saw a note taped to the door telling the mail carrier to leave packages at the front door. As the postal inspector began walking back to his postal vehicle with the envelope, he was approached by SLATTERY, who was already outside. SLATTERY was positively identified, as the surveillance captured his tattoos which matched prior mug shots of SLATTERY taken in Florida.

15.     SLATTERY confirmed the envelope was his, that he was "Pomponio," that he and SKYE were not married, and that SKYE resided with him. The inspector then walked SLATTERY to the door of the RESIDENCE and asked SLATTERY to unlock it so the postal inspector could confirm it was SLATTERY's apartment. Once SLATTERY unlocked the door of the RESIDENCE, the postal inspector handed the envelope to SLATTERY, and SLATTERY entered the RESIDENCE. A female resembling a DMV photo of SKYE was later seen outside

smoking with SLATTERY. SKYE's Toyota Hatchback, with VA plate # WSK-6992, was also identified in front of the RESIDENCE.

16. On or about July 26 to July 28, 2018, I reviewed records and CCTV footage at the Arlington North Post Office located in Arlington, Virginia. The CCTV footage showed SLATTERY and SKYE cashing the money order sent from DH. In reviewing the CCTV at the Post Office, I identified SLATTERY from his tattoos which matched prior mug shots of SLATTERY taken in Florida, and I identified SKYE from her driver's license photo. The CCTV footage showed both SLATTERY and SKYE waiting in line and speaking to the person at the front desk, and they left after successfully cashing the money order. An image record of the transaction also showed that SKYE executed the money order and provided her Virginia Driver's License, T65358182.

17. In or around August of 2018, I obtained and reviewed records provided by DH's son, which identified the aliases and suspected amounts sent to SLATTERY and SKYE. DH's son also provided bank records from DH's bank accounts which showed corresponding cash withdrawals on or about the same time she sent money. The receipts showed that DH sent mail money orders and wired money through Western Union and Walmart. DH also purchased Green Dot prepaid cards and provided SLATTERY and SKYE the PIN numbers so they could transfer the funds to their Green Dot account in order to withdraw it in cash. According to DH's hand written notes, recorded calls, and statements provided by her family, the following payments were either mailed to the RESIDENCE or sent by wire services to SLATTERY and SKYE:

| Date | Location | Description | Amount |
|------|----------|-------------|--------|
| 12/26/2017 | Dollar General #03504 | Green Dot Prepaid Card (wired) | 500.00 |
| 1/9/2018 | Food City #669 | Western Union (wired) | 804.00 |
| 1/17/2018 | Food City #669 | Western Union (wired) | 804.00 |
| 2/5/2018 | Walmart 620 | RIA Financial Services (wired) | 750.00 |
| 2/10/2018 | Walmart 620 | RIA Financial Services (wired) | 1,000.00 |

| 2/10/2018 | Walmart Bristol, TN | RIA Financial Services (wired) | 1,000.00 |
|---|---|---|---|
| 2/12/2018 | Walmart 620 | RIA Financial Services (wired) | 500.00 |
| 2/14/2018 | Blountville Walgreens | Green Dot Prepaid Card (wired) | 450.00 |
| 2/20/2018 | Walmart 2089 | RIA Financial Services (wired) | 300.00 |
| 2/20/2018 | Walmart 2089 | RIA Financial Services (wired) | 300.00 |
| 2/20/2018 | Walmart 599 | RIA Financial Services (wired) | 1,000.00 |
| 2/20/2018 | Colonial Hgts Walgreens | Green Dot Prepaid Card (wired) | 250.00 |
| 2/20/2018 | Colonial Hgts Walgreens | Green Dot Prepaid Card (wired) | 200.00 |
| 2/22/2018 | Walmart 2089 | RIA Financial Services (wired) | 450.00 |
| 2/22/2018 | Walmart 2089 | RIA Financial Services (wired) | 450.00 |
| 2/26/2018 | Walmart 2089 | RIA Financial Services (wired) | 450.00 |
| *3/13/2018* | *Blountville FedEx* | *FedEx Priority Overnight (mailed)* | *1,500.00* |
| *3/14/2018* | *Blountville FedEx* | *FedEx Overnight ($1500 cash split between 3/13 & 3/14/2018 envelopes) (mailed)* | * |
| 3/19/2018 | Blountville Walgreens | Green Dot Prepaid Card (wired) | 230.00 |
| 3/21/2018 | Walmart 2089 | RIA Financial Services (wired) | 900.00 |
| 3/23/2018 | Walmart 2089 | RIA Financial Services (wired) | 250.00 |
| 3/29/2018 | Blountville Post Office | USPS Express Mail (mailed) | 1,500.00 |
| 3/30/2018 | Blountville Walgreens | Green Dot Prepaid Card (sired) | 250.00 |
| 5/1/2018 | Blountville Post Office | USPS Express Mail (mailed) | 450.00 |
| 5/4/2018 | Walmart 599 | RIA Financial Services (wired) | 400.00 |
| 5/25/2018 | Walmart 599 | RIA Financial Services (wired) | 400.00 |
| 5/31/2018 | Blountville Post Office | USPS Express Mail (mailed) | 400.00 |
| 6/1/2018 | Office Depot | Green Dot Prepaid Reload (wired) | 420.00 |
| 6/5/2018 | Blountville Walgreens | Green Dot Prepaid Card (wired) | 460.00 |
| 6/5/2018 | Blountville Walgreens | Green Dot Prepaid Card (wired) | 390.00 |
| 6/5/2018 | Blountville FedEx | FedEx Priority Overnight (mailed) | 700.00 |
| 6/6/2018 | Blountville Walgreens | Green Dot Prepaid Card (wired) | 100.00 |
| 6/6/2018 | Blountville Walgreens | Green Dot Prepaid Card (wired) | 500.00 |
| 6/29/2018 | Blountville Walgreens | Green Dot Prepaid Card (wired) | 500.00 |
| 6/29/2018 | Blountville Post Office | USPS Express Mail (mailed) | 500.00 |

As indicated in the table above, DH wired and mailed at least approximately $19,000 to SLATTERY and SKYE since at least December of 2017. There is no evidence of any service or restitution being provided to DH.

8

*Elderly Victim R.F.*

18.     On August 14, 2018, an analyst with USPIS learned of a new Express Mail envelope being delivered to Renee SKYE at the RESIDENCE. The envelope had been sent by a 72-year old female, R.F. (RF) from Rio Rancho, New Mexico. Postal Inspectors contacted RF that same day, and RF stated she was mailing money to a man named "Christopher Wallace" who called RF from (305) 922-XXXX, the same number used by SLATTERY and the same number "Eric Green" used to call DH.

19.     RF stated she mailed the money to the RESIDENCE because "Christopher Wallace" told her it would be used to pay fees and taxes related to restitution she would be receiving as a victim of a previous time share scam. RF said "Christopher Wallace" had directed her to send $600 in cash, which RF mailed through USPS Express Mail to the RESIDENCE the day prior from New Mexico. In addition, RF had sent at least two wires in August of 2018 through Western Union at the direction of "Christopher Wallace."

20.     Immediately before "Christopher Wallace" began calling RF, receipts from RF indicated RF had also sent thousands of dollars as wire transfers to a man named "Mark Sellers" for the same purpose. On the receipts, RF had written (305) 922-XXXX, the number used by SLATTERY, "Christopher Wallace," and "Eric Green." However, RF did not know if "Christopher Wallace," and "Mark Sellers" had the same voice.

21.     RF could not recall the total amount sent to SLATTERY because RF did not know where all the receipts were. RF was able to locate two Western Union receipts, however, showing she wired money on August 11, 2018, for $250 and again on August 13, 2018, for $100. Later, RF discovered she had also mailed cash through UPS Overnight Priority to SKYE at the

RESIDENCE, but could not recall how much was sent. RF said she has sent thousands of dollars going back years, but could not recall all the details.

22. On or about August 15, 2018, RF provided consent to conduct several recorded calls with "Christopher Wallace" who called RF from (305) 922-XXXX. During those recorded conversations, "Christopher Wallace" again requested RF to send money so that she could receive a large restitution check. During the recording, RF requested written proof that her restitution was real. RF requested "Christopher Wallace" email her proof, and "Christopher Wallace" agreed. After receiving an email from "Christopher Wallace," RF said she somehow deleted it. RF was told to terminate all further communications with "Christopher Wallace" and others. I listened to and compared the recordings of the voices claiming to be "Christopher Wallace" and "Eric Green"—both of which came from the telephone number (305) 922-XXXX on the recorded calls with DH and RF—and they appeared to be the same person. This person also appeared to have the same voice as SLATTERY.

23. On or about August 14, 2018, USPS employees located at the Consumer Affairs office in Merrifield, Virginia requested the assistance of USPIS. According to at least one employee, a man had walked into the office and was acting strangely. The man was looking for an Express Mail envelope. A Postal Inspector assigned to the narcotics team responded and sat inside the Consumer Affairs Office taking notes, but he did not identify himself as law enforcement. The Postal Inspector saw two individuals at the counter asking about a missing package. He observed one white female with black hair and one white male with several tattoos all over his body. The female identified herself as SKYE, and provided her Virginia Driver's License, displaying number T65358182, in the name Renee Marie Skye. SKYE also provided her address as the RESIDENCE.

24.     The male said his name was "Shawn Collins," but he did not provide an identification card. Instead, he provided the Postal Inspector with his contact information on a handwritten note with the name "Shawn Collins" and the address for the RESIDENCE. The Postal Inspector later positively identified SLATTERY to be the man representing himself as "Shawn Collins" from still photographs of SLATTERY taken from the July 25, 2018 video, referenced above, showing SLATTERY accept a package from DH at the RESIDENCE. I also positively identified "Shawn Collins" as SLATTERY from the Postal Inspector's description of his tattoos, which matched prior mug shots of SLATTERY taken in Florida.

25.     SKYE initially was the person inquiring about the missing package, explaining it was sent from RF in Rio Rancho, New Mexico, but was being returned to the sender. However, SLATTERY quickly took over the conversation and did most of the talking for the two. SLATTERY told the employees this package was very important and he was worried his boss would not accept that it was missing. SLATTERY explained he was involved in a business that dealt with precious metals and commodities and someone had leveraged $20,000 to make this happen. SLATTERY said SKYE had not worked in 26 months and he was responsible for paying their rent along with his father's rent, among other liabilities. SLATTERY said he stood to make a good commission from this package, but now he will miss his deadline and will probably be fired.

26.     The Postal Inspector described SLATTERY as agitated, sweating heavily, and repeating his words. Consumer Affairs employees stated they would contact him if the package was located. The Postal Inspector covertly followed SLATTERY and SKYE to identify their vehicle, while taking photographs. He saw both drive away in the vehicle. The Postal Inspector was unaware of the fraud investigation into these two individuals; he discovered the active case

11

the following the day while searching internal law enforcement databases. There is no evidence of any service or restitution being provided to RF.

*Potential Elderly Victim L.A.*

27.     On or about August 30, 2018, USPIS was contacted by a USPS Postmaster of the Hillsboro, Kansas Post Office. The Postmaster informed postal inspectors that a longtime customer was sending large amounts of money orders and potentially cash through her post office. The Postmaster identified the potential victim as 78-year old L.A ("LA"). She knew LA had been victimized in past schemes, including a timeshare scam, in which he was told he needed to pay an attorney money to get rid of his timeshare. Therefore, the Postmaster knows LA is vulnerable to scammers, and she questions him about the contents of any overnight mail he brings to the post office.

28.     LA had appeared more frequently at the Hillsboro Post Office over the last few months, which led the Postmaster to believe LA was being defrauded again. LA began requesting large money orders and placing them into Express Mail envelopes addressed to a person named SKYE at the RESIDENCE in Virginia. When USPS employees began to question LA about the large money orders he was purchasing and then mailing to Virginia, LA stopped purchasing money orders at the Hillsboro Post Office. Instead, LA began coming to the post office with Express Mail envelopes already filled out and sealed, but post office employees noted the envelopes were still mailed to SKYE at the RESIDENCE. When the Postmaster asked what the contents of the envelope were, LA responded saying a notebook or documents.

29.     On or about August 22, 2018, LA mailed a Priority Mail envelope through the Hillsboro Post Office. The next day, however, LA returned distraught that the envelope had not been delivered to the recipient at the RESIDENCE. At or around the same time as LA visited the

Hillsboro Post Office, an unidentified man called the Postmaster at the Hillsboro Post Office claiming to be the recipient of the envelope, and asked for a delivery status because the envelope from LA was late. The Postmaster explained that the envelope was not late because it was sent Priority Mail and not Express Mail; it would take a couple more days to arrive at the RESIDENCE. The Postmaster then asked the man if he wanted her to request a change of delivery or return to sender. The man replied no and ended the call. The Postmaster stated the man never gave his name, but that the man's voice sounded much younger than LA.

*Summary of Recorded Phone Calls with Identified Victims*

30.     All of the victims or potential victims I have identified have sent multiple payments to SLATTERY and SKYE, with no evidence of any service or restitution being provided to them. As explained above, two identified elderly victims, DH and RF, agreed to conduct consensual telephonic recordings with their suspected scammer. Both victims agreed to assist USPIS by allowing their calls to the scammer to be recorded. Approximately six recordings with SLATTERY and SKYE were conducted, confirming the information provided by the victims. In all of these recorded calls SLATTERY is heard asking for payment or requesting the status of a payment. When victims told him they did not have the money, SLATTERY would ask for a lower amount and continue to call until he confirmed the money was sent. The length of the recorded calls ranged from less than a minute to approximately 30 minutes. According to statements by identified victims, a female named "Sophia" also answered the phone and claimed to be an assistant or secretary.

*SLATTERY Inquiry at the Oakton Post Office*

31.     On September 14, 2018, I interviewed the Post Office Manager in Oakton, Virginia, about past contact he may have had with SLATTERY and SKYE. Earlier, in July 2018,

13

a USPIS analyst informed the Oakton Manager that the RESIDENCE was involved in an investigation, and any contact with potential residents should be relayed to USPIS. After learning of the investigation, the Oakton Manager directed his employees to contact him directly if any person inquired, by telephone or in-person, about any parcel or envelope regarding the RESIDENCE. As explained below, the Oakton Manager explained he had a number of telephone calls and visits from individuals he later identified as SKYE and SLATTERY, with SLATTERY using the name "Shawn Collins." The Oakton Manager also stated he had met both in person and spoke with them on the phone several times from July through September of 2018. The reason the Oakton Manager communicated with "Shawn Collins" and SKYE was because they wanted to know why an Express Mail envelope was delayed and why another envelope was returned to sender.

32.     The Oakton Manager stated that on or about August 14, 2018, a USPIS analyst notified him that an Express Mail envelope was coming from New Mexico and destined for the RESIDENCE. The Oakton Manager was to intercept the envelope and hold it for postal inspectors in order to return it to the sender. The Oakton Manager was further directed to tell SKYE and the man named "Shawn Collins," should they call, that the recipient address was incorrect. The Oakton Manager said USPIS had altered the tracking data on the USPS website to give the appearance that the envelope had initially arrived in Oakton and was out for delivery, but later state it was being returned to sender because of an incorrect delivery address. The change in status caused "Shawn Collins" and SKYE to begin calling and making several visits to the Oakton Post Office, attempting to stop the return of the package. During one such visit, "Shawn Collins" became increasingly agitated that the Oakton Manager still could not provide assistance, coming around the counter and making the Oakton Manager feel physically

threatened. Later that same day, the Oakton Manager reported that SKYE called him to stop the return of the envelope, and SKYE apologized for "Shawn Collin's" behavior.

33.     The Oakton Manager remembered what both "Shawn Collins" and SKYE looked like and said he could identify their voices. The Oakton Manager identified "Shawn Collins" as SLATTERY from the photos I showed him taken on August 14, 2018, referenced above, by the Postal Inspector in Merrifield, Virginia, and the Oakton Manager identified SKYE from a recent photograph. SLATTERY also provided the phone number (305) 922-XXXX (known to law enforcement) to the Oakton Manager if the package was located. The Oakton Manager was also asked to listen to several recordings and say if he recognized the voices, and he listened to two recorded calls with victims. Within seconds of hearing the male voice speak, the Oakton Manager identified the man talking as SLATTERY. The Oakton Manager also listened to a recording of a female voice talking to a victim, and he stated he was "nearly certain" the voice belonged to SKYE.

*Search of Postal Records and USPS Interview*

34.     A search of internal US Postal Service databases identified all Express Mail, Priority Mail and parcels delivered to the RESIDENCE from August 2017 through September 18, 2018. Approximately 46 USPS Express and Priority Mail envelopes were mailed to the RESIDENCE. The U.S. Postal database also identified the sender and the return address of the sender. I then ran these names and addresses through commercial databases, which included names, addresses, and dates of birth. According to these commercial databases, it appears that the vast majority of these envelopes were mailed and paid for by elderly individuals. All 46 envelopes were light, weighing less than an ounce.

35.     On September 13, 2018, I interviewed the USPS mail carrier assigned to the

RESIDENCE. The mail carrier recalled delivering approximately one to two Express Mail envelopes per week to the RESIDENCE, and that there was a note on the RESIDENCE door stating to leave all packages at the door. The mail carrier always knocked on the door of the RESIDENCE when she left the packages at the door, and usually a large man, who she identified from a photograph as SLATTERY, was either outside waiting for her or he would open the door after she knocked. The mail carrier also recalled seeing FedEx leaving packages at his door. The mail carrier remembered she had one conversation with SLATTERY about using Priority Mail instead of Express Mail because of the high cost, and SLATTERY stated the contents were time sensitive. The mail carrier also recalled seeing a female with SLATTERY, and stated that she delivers mail for SKYE, SLATTERY, and another female name she could not recall. The mail carrier stated SKYE and SLATTERY moved into the RESIDENCE during the summer of 2017.

CONCLUSION

36.     Based on the foregoing, I respectfully submit that this affidavit supports probable cause to believe that SLATTERY and SKYE have committed mail fraud, in violation of 18 U.S.C. § 1341, by having devised or intended to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises for the purpose of executing such scheme or artifice or attempting so to do, caused to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or taken or received therefrom, any such matter or thing, or knowingly caused to be delivered by mail or such carrier according to the direction thereon.

Subscribed and sworn to before me
on September 27 , 2018

_____ /s/_____
Ivan D. Davis
United States Magistrate Judge

Respectfully submitted,

_____
Ray Campbell
Postal Inspector
United States Postal Inspection Service